OPINION OF THE COURT
Bryanne A. Hamill, J.
Background
On May 14, 2009, the Administration for Children’s Services (hereinafter ACS) filed a neglect petition against the respondent mother, Cala B. (hereinafter the respondent or mother), alleging that the two-month-old subject child Lanaya was brought to Beth Israel Hospital, where she was diagnosed with failure to thrive syndrome; according to hospital personnel, the respondent failed to feed the child properly because the mother was suffering from depression, for which she was hospitalized in September 2008. The petition also states that at the time of the above incident the respondent’s two other children were on a trial discharge from a voluntary placement. The petition concludes that based on the foregoing all the children are neglected.
On May 14, 2009, ACS requested a removal of the three subject children from their mother and a remand to ACS, which was granted by the presiding intake judge. On May 14, 2009, the court issued an order directing ACS, pursuant to Family Court Act § 1017 (1), to investigate the children’s maternal uncle as a resource for the children. The respondent requested a Family Court Act § 1028 hearing, which was adjourned to this court on May 19, 2009.
On May 19, 2009, the parties agreed to a partial settlement. The two older children were placed into the care and custody of their mother, who consented to the continued remand of the *983 infant, Lanaya, with the understanding that the infant would be placed with the maternal uncle. ACS informed the court that it had conducted a State Central Registry clearance for the uncle, but failed to submit a written investigative report on him, pursuant to Family Court Act § 1017, as ordered on May 14, 2009.
At the May 19 hearing, the uncle answered this court’s extensive inquiry regarding his background, his employment status and his home. Based on his sworn testimony, this court found him to be a suitable relative to care for this infant and issued an order directing that Lanaya would be placed restrictively with him pending an expedited foster parent certification, pursuant to Family Court Act § 1017 (2) (a) (iii). This court, having determined that it was in the best interests of Lanaya to be placed with the uncle, instructed ACS that if the uncle could not be certified, ACS must file an order to show cause asking to lift the restriction (hearing tr at 10, 11, May 19, 2009). This court further ordered that the respondent could have liberal visits with Lanaya supervised by the maternal uncle, so that the infant and her mother could bond. The case was adjourned to May 26, 2009. On that date this court was informed that the infant was still in a nonkinship foster home. Neither ACS nor the agency gave this court any legal reason why its prior order was not followed; accordingly, this court issued an order specifying that Lanaya be placed with the maternal uncle no later than 8:00 that evening, subject to contempt of court.
On May 27, 2009, the respondent’s counsel filed this instant order to show cause, seeking a contempt finding against ACS and the Jewish Child Care Association (hereinafter JCCA or agency) for their failure to place the child with the uncle as well as for interim relief that Lanaya be immediately placed with him. On that date, respondent’s counsel learned that Lanaya was in the process of being sent to the uncle’s home. Because the motion was procedurally defective as it failed to state the necessary warnings for contempt, the respondent re-filed the motion on June 11, 2009, with service by June 22, 2009. The motion was calendared for July 8, 2009 for service and oral argument.
On July 1, 2009, the respondent requested a Family Court Act § 1028 hearing for the immediate return of Lanaya. On July 6, 2009, after the section 1028 hearing, the court granted the respondent’s application over the objection of ACS, and Lanaya was placed into the care and custody of her mother under ACS *984 supervision, with certain conditions and services in place. ACS did not seek a stay or appeal of this order. The court found that the risk of emotional harm to Lanaya by continuing the removal outweighed any risk to her in the respondent’s care and custody. Inasmuch as services had sufficiently mitigated such risk, the best interest of Lanaya was to be returned to her mother.
On July 8, 2009, the attorney for JCCA requested an adjournment to submit opposition papers, which request was granted insofar as the court did not have proof of service on Paul Torres of JCCA and ACS Commissioner Mattingly. ACS submitted its opposition on July 8, 2009; JCCA submitted its opposition on July 15, 2009; the respondent submitted a reply on July 27, 2009.
On July 29, 2009, this court heard oral argument.[1] In support of her argument, the attorney for the child, who supports the mother’s motion but had not submitted any written papers, referenced the Family Court Act § 1028 testimony and the court’s finding. ACS requested an opportunity to submit supplemental papers to address these arguments, which was granted; on August 14, 2009, ACS submitted a supplemental affirmation in opposition.
The respondent argues in her motion that between the filing of the petition on May 14, 2009 and the filing of the first order to show cause on May 27, she was allowed only two short visits, both agency-supervised, with her infant daughter. Respondent’s counsel affirms that (a) on May 19 she informed ACS counsel that ACS was in violation of the May 19 order; (b) on May 20 she informed counsel for JCCA that the agency was in violation of the court order and faxed him a copy of it;, (c) on May 21 ACS informed her that Lanaya was not placed with her maternal uncle because his paramour was the subject of a December 2008 SCR report that was deemed unfounded; and (d) on May 26, 2009 the court issued a second order directing placement of Lanaya with the maternal uncle no later than 8:00 p.m. that same date, subject to a finding of contempt. However, ACS did not place Lanaya with her uncle until the late afternoon of May 27, 2009. The respondent argues that the petitioner’s contempt *985 has interfered with the mother’s rights to have liberal visiting and bonding time, supervised by the maternal uncle, with her infant child.
ACS argues that (a) the respondent has failed to present that the ACS commissioner, its attorney and caseworker sought to avoid or disobey the order of the court; (b) it is self-evident that if the court directs a child placed in a particular home, that direction is subject to the home being cleared to secure the safety of the child; (c) it could not complete its investigation of the maternal uncle by May 19 because it did not have a current telephone number for him; (d) it could not complete its assessment of the uncle by May 26 because of concerns about his resident girlfriend; (e) only after May 26 could the agency comply with the court order, but the caseworker was unable to reach the foster mother until the next day; (f) the motion should be denied because the respondent has failed to show that she had been harmed; and (g) the respondent’s inability to have liberal visits at the maternal uncle’s home is clearly speculative and not evidence of measurable or specific injury.
The respondent, submitting a reply to ACS’s opposition, contends that (a) ACS/JCCA had every opportunity to seek a modification or a vacatur of the May 19 and 26 orders, but failed to do so; (b) ACS cannot claim that the court lacks the authority to issue those orders; (c) the court had the authority to place the child with the maternal uncle on May 19, pursuant to Family Court Act § 1017 (2); (d) all parties agree that the child was not placed with the uncle until May 27, in violation of the May 19 and 26 orders; and (e) because the child was not placed with the uncle, the respondent was deprived of extensive parenting and bonding time with her infant, supervised by a loving family member.
At oral argument of the motion on July 29, 2009, Lanaya’s attorney, who supports the mother’s motion for contempt, argued that (a) Lanaya was harmed by the delay in placing her with the uncle, because it denied Lanaya the most liberal of visitation with her mother and denied the infant’s siblings the opportunity to bond with her; and (b) the court should place significant emphasis on the fact that subsequently, Lanaya was reunited with her mother, because the credible testimony from the section 1028 hearing reveals that when Lanaya was placed with the uncle, the mother visited the infant regularly for 6 to 10 hours a day, not simply the maximum of two hours, twice a week at the foster care agency.
*986 ACS has submitted a supplemental reply to the child’s attorney’s oral argument, contending that (a) such argument is specious and speculative; (b) the court’s July 6 decision, which granted the respondent’s section 1028 application, found that the mother’s alleged quality of child care only partially determined the court’s decision, which also included extensive services for the respondent; and (c) the court’s decision to grant the respondent mother’s Family Court Act § 1028 application does not compel a conclusion that either the mother or child suffered compensable harm as a result of the alleged violation of this court’s orders.
The respondent is seeking civil contempt sanctions in the amount of $250 for each day the child was not placed with the uncle, totaling $2,250, plus costs and expenses associated with the motion.
Analysis
According to Merril Sobie, 2007 Supplementary Practice Commentaries (McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1017, 2009 Pocket Part, at 220-221):
“The twenty-first century is still young, but in its initial six years the legislature has amended Section 1017 four times. As it now stands the Section grants the court greatly expanded authority to place a child, temporarily or permanently, directly with either a) a non-respondent parent, b) a collateral relative, including but not limited to a grandparent, i.e. a ‘kinship’ placement, c) any other ‘suitable person’, d) the local Commissioner of Social Services for placement with a relative or other suitable person assuming an investigation finds the individual to be qualified [§ 1017 (2) (a) (iii)], or e) the Commission[er] of Social Services for placement in a specific certified ‘stranger’ foster home [§ 1017 (2) (b)].
“The relevant Social Services Commissioner has a concomitant responsibility to conduct an investigation to locate any non-respondent, parent, relative, or other suitable person who may care for the child . . . The legislature was apparently unhappy with the dearth of kinship or, more broadly, individualized placements, and eager to advance extended family preservation. For better or for worse, the issue has been addressed by sequential amendment. Consequently, the statutory preference for specific
*987 court directed placements has gradually become extremely pronounced, and the authority of the court in fashioning a placement has been enhanced while, conversely, the authority of the local departments of social services ha[s] been significantly diminished.” (Emphasis added.)
The relevant portion of Family Court Act § 1017 states, in part:
“2. The court shall, upon receipt of the report of the investigation ordered pursuant to subdivision one of this section:
“(a) where the court determines that the child may reside with a suitable non-respondent parent or other relative or other suitable person, either: . . .
“(iii) remand or place the child, as applicable, with the local commissioner of social services and direct such commissioner to have the child reside with such relative or other suitable person and further direct such commissioner pursuant to regulations of the office of children and family services, to commence an investigation of the home of such relative or other suitable person within twenty-four hours and thereafter approve such relative or other suitable person, if qualified, as a foster parent. If such home is found to he unqualified for approval, the local commissioner shall report such fact to the court forthwith.” (Emphasis added.)
A literal reading of Family Court Act § 1017 (2) (a) gives the court authority to determine that a relative is suitable for a child’s placement. The statute does not grant discretion to ACS or the Agency to “stay” the placement of the child until it completes its investigation or to refuse to place the child in the court-ordered home. “[I]t is a fundamental principle of statutory construction that a court must construe a statute in a manner that will give effect to every word, if possible, and every word, phrase, clause or paragraph must be presumed to have some meaning.” (Matter of Tristram K. [Jing K.], 36 AD3d 147, 151 [1st Dept 2006].) Further, it is obvious from the statutory language that the legislature, when enacting Family Court Act § 1017, considered the public policy favoring placement of children with loving, extended family members, when they must be removed from their parents. Generally speaking, placement with a relative mitigates the risk of emotional harm to the child during the removal, and will increase the contact between the parent and child to facilitate reunification.
*988 In Matter of W. Children (167 AD2d 478 [2d Dept 1990]), the Second Department held that the Family Court had the power to direct the Commissioner of the Department of Social Services to place a child in foster care with a relative even if a previously neglectful parent lived at the same residence. The Court found,
“Other than the child’s best interests, the statute does not place any restrictions on a court when determining whether a child is to be placed with a relative. Thus, when it is appropriate for a child to reside with a parent, even after a finding of neglect, whether or not that parent resides in the same residence as the potential custodial relative is irrelevant to the issue of whether or not the court has the authority to order the Commissioner to place the child in the relatives’ home.” (Id. at 478-479.)
In Matter of Harriet U. v Sullivan County Dept. of Social Servs. (224 AD2d 910 [3d Dept 1996]), the Court found,
“One purpose of Family Court Act § 1017 is to help safeguard the infant’s physical, mental and emotional well-being. Placement with a suitable relative can help the child by maintaining family ties and reducing trauma of removal.
“In making a determination of placement, Family Court must consider not only the custodian’s ability to provide shelter, but all the facts and circumstances relevant to the child’s best interest.” (Id. at 911 [citations omitted].)
With respect to civil contempt, the Court of Appeals in Matter of McCormick v Axelrod (59 NY2d 574, 583 [1983]) stated:
“In order to find that contempt has occurred in a given case, it must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. It must appear, with reasonable certainty, that the order has been disobeyed. Moreover, the party to be held in contempt must have had knowledge of the court’s order, although it is not necessary that the order actually have been served upon the party. Finally, prejudice to the right of a party to the litigation must be demonstrated (see Judiciary Law, § 753, subd A).” (Citations omitted.)
Family Court Act § 156 states:
“The provisions of the judiciary law relating to civil and criminal contempt shall apply to the family *989 court in any proceeding in which it has jurisdiction under this act or any other law, and a violation of an order of the family court in any such proceeding which directs a party, person, association, agency, institution, partnership or corporation to do an act or refrain from doing an act shall be punishable under such provisions of the judiciary law, unless a specific punishment or other remedy for such violation is provided in this act or any other law.”
Judiciary Law § 773 states, in part: “Where it is not shown that such an actual loss or injury has been caused, a fine may be imposed, not exceeding the amount of the complainant’s costs and expenses, and two hundred and fifty dollars in addition thereto, and must be collected and paid, in like manner.”
On May 14, 2009, the intake judge at arraignment ordered ACS to investigate and report to the court the results of the investigation of the maternal uncle as a resource for Lanaya. On May 19, neither ACS nor the foster care agency had a report of the ordered investigation available for the court. After an extensive inquiry of the maternal uncle, this court found him to be a suitable relative with whom it served the best interests of the child to be placed, and ordered that the child be restrictively placed with him, pursuant to Family Court Act § 1017 (2) (a) (iii), essentially dispensing with the submission of the investigation and report in advance of the placement due to the delay. In accordance with Family Court Act § 1017 (2) (a) (iii), this court ordered that if the uncle’s home could not be certified, ACS shall move before this court to vacate or modify the order.
It is undisputed that ACS did not comply with the May 19 order, which directed that Lanaya be placed in her uncle’s home, or move the court to vacate or modify the order. Although the order was not personally served on the Commissioner, the caseworker for the foster care agency, JCCA, the ACS caseworker and ACS counsel were present in court when the order was issued. ACS did not seek a stay of the order nor move to modify the order when the agency allegedly was unable to complete its investigation.
The order further authorized this mother and her infant to have liberal visiting and bonding in a natural setting, supervised by her uncle. ACS’s own visiting policy mandates that the lowest level of supervision which safeguards the well-being of the *990 child should be chosen.[2] The failure of ACS and its foster care agency to place the infant with the maternal uncle severely restricted the mother and infant contact to two short visits, both agency-supervised in the agency office. As respondent’s counsel argues in her reply, “Liberal as applied to visits is widely understood to describe visits that are unrestricted in their frequency.”
Nor did ACS comply with the May 26 order, inasmuch as Lanaya was not placed by 8:00 p.m. nor even by the afternoon of the next day. ACS argues that the agency was prepared to comply, but it could not locate the foster mother, who was away for the day with the child. As such, ACS claims its inability to comply with the May 26 order was not of its own making.
However, “[i]nability to comply with a court order may be a defense to a charge of contempt, but not if the defendant created his own inability.” (United States v Swingline, Inc., 371 F Supp 37, 45 [ED NY 1974] [citations omitted].) Similarly, the court in Matter of Terry (151 Misc 2d 48 [Fam Ct, NY County 1991]) held the Commissioner of Social Services in contempt where she was aware of a clear and unequivocal order of the Family Court and failed to obey it, and the child suffered substantial damage and prejudice to her rights as a result. The court found that the Commissioner had failed to commence the proceeding during the time that the court had prescribed and to pursue diligent efforts in working with the child’s parents. (Id. at 53.) Additionally, a “mere act of disobedience, regardless of motive, is sufficient to sustain a finding of civil contempt where . . . such disobedience prejudices the rights of a party.” (Matter of Ryan v Caputo, 218 AD2d 806, 808 [2d Dept 1995].)
Here, ACS did not comply with the May 26 order because it failed to comply with the May 19 order. Further, ACS should have been in close contact with the foster mother, especially in light of the placement issues on this adjourned date.
The Third Department in Matter of Bonnie H. (145 AD2d 830 [3d Dept 1988]) held that the respondent (Commissioner of Social Services) was properly found in contempt for terminating support services and denying visitation to a mother whose children had been found to be neglected. In Bonnie H., the mother signed surrender instruments which were not filed with the court, because the father refused to execute the agreements. *991 The Commissioner denied the mother visitation with the children and the Family Court held the Commissioner in civil contempt, finding that his argument that he acted in good faith and in the best interests of the child was not a defense. “It is Family Court which makes the order of disposition of children found to be neglected and once the order is made, respondent has no discretion but to comply with that order.” {Id. at 831 [citations omitted].)
Here, ACS contends that the contempt motion should be denied because the respondent has failed to show that she was harmed inasmuch as her claims of injury based on her inability to have liberal visits are speculative, not measurable or specific. Further, ACS contends that the court’s decision to grant the respondent mother’s Family Court Act § 1028 application and return Lanaya to her does not compel a conclusion that the mother or child suffered compensable harm as a result.
On July 6, 2009, during the Family Court Act § 1028 hearing, the caseworker, Ms. Ademóla, described the positive reports from the foster care agency worker who supervised the mother’s visits. “The mother is appropriate and she feeds the child and [the foster care agency worker] did not have any concerns.” (Section 1028 hearing tr at 102, July 6, 2009.)
The maternal uncle testified that since Lanaya was placed with him, her mother visited her regularly, spending up to eight hours a day parenting her. He testified, “She feeds the baby, she burps the baby and washes the baby.” He also testified that the mother brought her other children with her, promoting the siblings’ attachment to their sister. (Section 1028 hearing tr at 33, 37, 38, 39, July 6, 2009.)
This court credited both the testimony of the caseworker and maternal uncle, and granted the respondent’s application, returning Lanaya to her mother. This court found, based upon the documentary and credible evidence, that the mother has been responsible for parenting and regularly feeding Lanaya while she was in kinship foster care. This court had an opportunity to observe the mother and infant interaction, where she was appropriate and smiling at Lanaya, who was cooing in response to her mother’s facial expressions. Pursuant to the standards enunciated by the Court of Appeals in Nicholson v Scoppetta (3 NY3d 357 [2004]), this court found that the risk of emotional harm to this infant in being removed from her mother outweighed any risk to this infant in her mother’s care and custody, and that it factually served the best interests of Lanaya *992 to be returned to the care and custody of her mother. (Section 1028 hearing tr at 122, 125, July 6, 2009.) Notably, ACS did not seek a stay or appeal this order.
Here, the neglect petition against the respondent alleges that Lanaya was suffering from failure to thrive, and that according to the hospital personnel, this condition was caused by the respondent’s failure to feed the child properly. The mother’s ability to care for this infant, after having liberal supervised visiting in a natural environment, was demonstrated at the section 1028 hearing. The evidence demonstrated that this mother was able to feed, parent and bond with the infant because Lanaya had been placed with the uncle. Had Lanaya remained in a nonkinship foster home, the mother could not have visited with the infant regularly for up to eight hours or more a day.
Accordingly, this court finds that there is no factual issue regarding the actual harm caused to this mother and her infant by ACS’s failure to comply with this court’s order, which severely restricted contact between the mother and her infant. To this end, the court finds that a hearing is not necessary as to whether ACS is in contempt of this court’s orders.
In Metzger v Metzger (206 AD2d 352 [2d Dept 1994]), the trial court found the defendant in contempt for failing to provide life insurance, pursuant to a court order. The Second Department affirmed, and held that the court was not required to conduct a hearing, as the appellant did not dispute the factual allegations.
In Bowie v Bowie (182 AD2d 1049 [3d Dept 1992]), the Appellate Division held, “It is well established that due process does not mandate a hearing in every instance where contempt is sought; it need only be conducted if a factual dispute exists which cannot be resolved on the papers alone.” (Id. at 1050.) The Court in Bonnie H. (145 AD2d at 832) further found that Family Court did not err when it denied the respondent an evidentiary hearing before deciding he was guilty of civil contempt. “Whether an evidentiary hearing was required rested wholly within the discretion of the court.” (Bonnie H. at 832.)
ACS indisputably did not comply with the May 19 and 26 orders of this court, which directed that the subject child be placed restrictively with the maternal uncle in kinship foster care. This placement would have allowed Lanaya’s mother liberal supervised visiting in the uncle’s home. Instead ACS kept the infant in stranger foster care, which limited contact to short agency-supervised visits. ACS concedes that it did not place the infant with the uncle as ordered, citing no legal reason for its *993 failure, nor did it come to court to have the order modified. The order was clear and unequivocal and ACS has not set forth any material factual dispute as a defense to this motion.
The respondent requests that the court hold ACS in civil contempt for each day it failed to comply with the order: nine days of visiting (from May 19 to 27) plus costs and expenses of bringing this motion.
The Court of Appeals in McCain v Dinkins (84 NY2d 216 [1994]) upheld the imposition of civil contempt penalties for each night the City was in violation of the court orders precluding housing of homeless families at welfare office emergency assistance units. The Court of Appeals held, “Insurmountable proof of municipal noncompliance was assembled and no escape theories are available on this record. Courts are justified and enjoy few alternative options in such circumstances except to exercise their ‘inherent power to enforce compliance with their lawful orders through civil contempt.’ ” (McCain at 227, quoting Shillitani v United States, 384 US 364, 370 [1966].)
The McCain Court further held,
“These fines against the City are as remedial as could be developed within the discretionary, equitable powers of the courts under the unusual circumstances of these matters. Thus, we affirm the Supreme Court’s imposition of these fine sanctions payable to those homeless families who were forced to spend nights at the EAUs with the confidence that these fines will serve as appropriate recompense for the failure to comply with the mandates of the courts.” (McCain at 229; see Matter of Department of Envtl. Protection of City of N.Y. v Department of Envtl. Conservation of State of N.Y., 70 NY2d 233, 239 [1987].)
The record here is clear: the respondent mother suffered loss of visiting and bonding time of eight or more hours per day with her daughter for each day that ACS failed to comply with this court’s mandate. For nine days of her infant’s life, this mother was not able to hold, feed, parent and bond with Lanaya, because she was placed in a stranger’s home instead of the home of a loving relative that this court held to be in the best interests of Lanaya. The Family Court Act § 1028 hearing testimony supports that when Lanaya was placed with her uncle, nine days after placement was first court-ordered, her mother was able to spend up to eight hours per day with her, and Lanaya, in turn, *994 was able to be parented by her mother. Thus, this court finds that this mother suffered daily compensable harm for which she shall be compensated for each day ACS was in contempt of its order.
Conclusion
Accordingly, this court holds ACS in civil contempt of court for its failure to comply with this court’s May 19 and 26 orders. Pursuant to Judiciary Law § 773, ACS shall pay to the respondent a fine of $2,250 plus costs and expenses, representing $250 per day for each day that ACS failed to comply with this court’s order. Respondent mother’s counsel shall submit a proposed order for costs and expenses within five days of this order.

. On July 29, 2009, a settlement between the respondent and JCCA was agreed to, and approved by the court. Whereas, JCCA without admitting any wrongdoing paid an undisclosed sum of money to the respondent. As such, the court will not be addressing JCCA’s opposition papers or oral argument in this decision.

. Memorandum of John Mattingly, ACS Best Practice Guidelines for Family Visiting Arrangements for Children in Foster Care (Aug. 28, 2006).